UNITED STATES BANKRUPTCY COURT        FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Fairfield Sentry Limited, et al.<br><br>        Debtors in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 10-13164 (JPM)<br><br>(Jointly Administered) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>Merrill Lynch International, et al.,<br><br>        Defendants. | Adv. Pro. No. 11-01463 (JPM) |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

*APPEARANCES*:

*Attorneys for Defendant, Merrill Lynch International*
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
By:    Pamela A. Miller
        Amber Covucci

*Attorneys for the Plaintiffs, Joint Liquidators*
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
By:    Jeffrey L. Jonas
        David J. Molton
        Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of the Defendant, Merrill Lynch International,

("Defendant" or "MLI") to dismiss the Third Amended Complaint (the "Amended Complaint")

for lack of personal jurisdiction.  Mot. to Dismiss, ECF[1] No. 96.  The Court held a hearing on the

Motion to Dismiss on October 25, 2023 (the "Hearing").  For the reasons set forth herein, the

Court DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and

the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court

previously concluded that it has subject matter jurisdiction over this and related actions.  *See In*

*re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018); *see also* Stip.

Order, ECF No. 98.  Personal jurisdiction is contested by the Defendant and will be discussed

below.

## III.    BACKGROUND

This adversary proceeding was filed on February 2, 2011.  Compl., ECF No. 1.  Kenneth

M. Krys and Greig Mitchell (the "Liquidators" or "Plaintiffs"), in their capacities as the duly

appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation)

("Sentry") and Fairfield Sigma Limited (In Liquidation) ("Sigma" and, together with Sentry, the

"Fairfield Funds") filed the third amended complaint on August 11, 2021 (the "Amended

Complaint").  Am. Compl., ECF No. 96.  Via the Amended Complaint, the Liquidators seek the

---

[1]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 11-01463-jpm unless
otherwise noted.

imposition of a constructive trust and recovery of over $16 million in redemption payments made to MLI by Sentry and Sigma. *Id.* ¶¶ 1, 8, 116–28.

## A. **The BLMIS Ponzi Scheme**

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[2] *Id.* ¶ 1.  Defendant allegedly invested into several funds, including Sentry and Sigma, that channeled investments into BLMIS.  *Id.* ¶¶ 2, 5.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 36–37; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund—what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money.").  Fairfield Sigma, in contrast, was an indirect feeder fund, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currency. Am. Compl. ¶¶ 36–37.  BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme.  *Id.* ¶¶ 6–7, 12–13.  Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart.  *Id.* ¶¶ 5–8, 12–13, 37, 40–43.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV").  *Id.* ¶¶ 7, 38. MLI is "one such investor."  *Id.* ¶ 7.  To calculate the NAV, administrators used statements

---

[2]    The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts.  *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).  I do not recount it here except as to provide context to the appeals.

provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 39.  In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 40.  The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id*.  The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares. *Id.* ¶ 43.  The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments. *Id.* ¶ 42.

Defendant MLI is a corporate entity organized under the laws of the United Kingdom with a registered address in London, United Kingdom.  *Id.* ¶ 32.  MLI subscribed into Fairfield Sentry and Fairfield Sigma and received approximately $16,077,850 in redemption payments from the Funds between August 14, 2016, and November 21, 2008.  *Id.* ¶¶ 8, 44.  At Defendant's "directions and instructions, [MLI] received $14,200,000 in Redemption Payments at its bank account with JP Morgan Chase in New York and $1,877,850 at its bank account with Citibank London." *Id.* ¶ 45.[3]

Bernard Madoff was arrested in violation of federal securities laws on December 11, 2008. *Id.* ¶ 104.  The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme.  *Id*.  On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 105.  In March 2009, Madoff pleaded guilty to criminal charges against him and confessed

---

[3]       Exhibits to the Amended Complaint show the dates and amounts of each redemption payment received by Defendant from Sentry and from Sigma.  *Id.* Exs. A, B.

to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 106–07. Madoff was sentenced to 150 years in federal prison and died in April 2021. *Id.* ¶ 108.

The Amended Complaint alleges that MLI "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated." *Id.* ¶ 120. The Amended Complaint further asserts that by 2006, Defendant had knowledge of the fraud perpetrated by Madoff and that "specific individuals at Merrill International ascertained multiple indicia of fraud, both from others within the Merrill Companies and independently," which lead MLI to believe that BLMIS was engaged in fraud and that the NAVs were inaccurate. *Id.* ¶ 120. These indicia included red flags raised through due diligence by MLI's parent company and secrecy surrounding BLMIS's returns and its investment strategy. *Id.* ¶¶ 121–22.

### B. **The Prior Litigation and Procedural History**

The Fairfield Funds were put into liquidation in the British Virgin Islands ("BVI") in 2009. *Id.* ¶¶ 25–27. The BVI issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 27. Pursuant to the appointment order of the BVI court,[4] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 114. The Liquidators initiated proceedings in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme. Mem. L. at 6, ECF No. 115; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also In re Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("Fairfield II").

---

[4]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1.

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the

Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings.

Am. Compl. ¶ 28, ECF No. 96.  This Court granted that recognition on July 22, 2010.  *Id.*  All

cases filed by the Plaintiffs were administratively consolidated before this Court in November

2010.  *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25; *see also* Am.

Consolidation Order, ECF No. 5.[5]

The Plaintiffs asserted multiple causes of action in those consolidated adversary

proceedings including, *inter alia*, mistaken payment and constructive trust.[6]  Compl. ¶¶ 94–154,

ECF No. 1;  *see also* 630 F. Supp. 3d at 479.  In October 2011, this Court stayed the U.S.

proceedings pending resolution of the BVI proceedings.  Am. Order Staying Redeemer Actions,

Adv. Pro. No. 10-03496, ECF No. 418.; *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *3

(Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for

restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014]

UKPC 9 ("*Migani* ").[7]  The Privy Council held that the Plaintiffs' claims for restitution in the

BVI to recover redemption payments arising out of transactions governed by the Funds' Articles

of Association are governed by BVI law.  *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption

payments thus depended on whether it was bound to make those payments under the "true NAV

per share, ascertained in the light of information which subsequently became available about

---

[5]     The Court vacated the consolidation order as to MLI on January 6, 2022.  Am. Order Regarding
Consolidation, ECF No. 129.

[6]     Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's
Insolvent Act § 245, and undervalue transactions under the Insolvent Act § 246.

[7]     *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without
numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL
1219748.

Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of

redemption." *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively

determined at the time of the subscription or redemption.  *Id.* ¶ 21.  The redemption payments

made under the NAV were thus not subject to restitution and the payee was not unjustly enriched

by receiving funds, even if the amount was mistaken.  *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco,

the Fairfield Fund's administrator, when it issued redemption certificates.  *See In re Fairfield

Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2018).

Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith

when it issued certificates for redemptions and was aware that the NAV was inflated at the time.

*See id.* at *6.  The Plaintiffs argued that the certificates would not be binding under the Funds'

Articles if they were not issued in good faith.  *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of

Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where

a Defendant knew the NAV was inflated at the time of redemption."  *Fairfield II*, 596 B.R. at

295.  Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive

trust against the so-called 'Knowledge Defendants' to proceed.  *Id.* at 301 ("The suggestion that

the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the

contract and requires restitution lacks support. The only exception concerns the Knowledge

Defendants that received redemption payments with the knowledge that the NAV was wrong. In

those circumstances, the Liquidators may seek to impose a constructive trust.").  In December

2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair

preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463. The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. Mot. to Amend, ECF No. 87; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737. On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions. Order Granting Mot. to Amend, ECF No. 95; Order Lifting Stay of Redeemer Actions, ECF No. 94.

### C. **The Pending Motion**

The Amended Complaint seeks the imposition of a constructive trust on the redemption payments received from the Fairfield Funds. Am. Compl. ¶ 128, ECF No. 96. The Amended Complaint alleges that MLI had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated. *Id.* ¶ 123 "By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma." *Id.* ¶ 125.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* ¶ 181 (citing 596 B.R. at 293). As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that MLI purposefully availed itself of the laws of the United States and the State of New York by "investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and, upon information and belief, maintaining bank accounts in the United States at JP Morgan Chase, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts." Am. Compl. ¶ 19, ECF No. 96. The Amended Complaint further alleges that Defendant "selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United-States based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts." *Id.*

The parties commenced personal jurisdiction discovery in September 2021 and completed it by July 2023. Scheduling Order, ECF No. 103. Hr' Tr. 9:16–18, ECF No. 165. Defendant reports producing over 3,500 pages of documents and other items to the Plaintiffs in discovery. Hr'g Tr. 103:10–13, ECF No. 170. Merits discovery is ongoing in this case. Fifth Am. Scheduling Order, ECF No. 175.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 3–5, ECF No. 115.

The Liquidators filed an opposition to the Motion and submitted declarations of David Flugman and Sara Joyce in support of their opposition. Opp'n, ECF No. 148; Declaration of

David S. Flugman in Support of Liquidators' Opposition ("Flugman Decl."), ECF No. 149;

Declaration of Sara K. Joyce ("Joyce Decl."), ECF No. 150.  The Liquidators argue that

exercising jurisdiction over Defendant would be reasonable and that Defendant's contacts with

the United States in knowingly and intentionally investing in the Fairfield Funds, using U.S.

correspondent accounts to invest in and receive payments from Sentry, communicating with the

Fairfield Funds' manager in New York, and other business activities support personal

jurisdiction.  Opp'n at 2–4, ECF No. 148.[8]  MLI filed a reply memorandum and a supporting

declaration of Pamela Miller on March 20, 2023.  Reply, ECF No. 151; Declaration of Pamela A.

Miller in Support of Defendant's Motion ("Miller Decl."), ECF No. 152.  This Court reviewed

the above filings and held a hearing on the Motion on October 25, 2023.  *See* Hr'g Tr., ECF No.

170.

## I.    DISCUSSION

### A.    The Law of Personal Jurisdiction

In order to subject a defendant to personal jurisdiction in the United States, due process

requires that the defendant have sufficient minimum contacts with the forum in which the

defendant is sued "'such that the maintenance of the suit does not offend traditional notions of

fair play and substantial justice.'"  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501,

516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"In adversary proceedings, courts must determine whether the defendant has minimum contacts

with the United States, rather than with the forum state."  *Picard v. Fairfield Greenwich Grp. (In*

---

[8]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal.  The Court held a status conference on December 18, 2023, during which the Court informed the parties that certain documents previously filed under seal might be cited, quoted, or otherwise referenced by the Court in this opinion.  *See* Notice of Hr'g, ECF No. 172.  The Court gave the parties the opportunity to withdraw from the record any previously sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the opinion.  The parties requested that the Court not refer to any bank account numbers in full or name any individual MLI employee; neither party requested withdrawal of any documents.

*re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman*

*Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)). "When jurisdiction is satisfied

through Bankruptcy Rule 7004,[9] a bankruptcy court need not address its state's long-arm

statute." *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124

F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the

forum, and the litigation," a relationship that "must arise out of contacts that the defendant

himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations

omitted). There are three conditions necessary for the Court to exercise specific jurisdiction[10]

over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of
> conducting activities within the forum State or have purposefully directed its
> conduct into the forum State. Second, the plaintiff's claim must arise out of or relate
> to the defendant's forum conduct. Finally, the exercise of jurisdiction must be
> reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation

marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule

of Civil Procedure Rule 12(b)(2), the Plaintiff "must make a prima facie showing that

---

[9]     "The summons and complaint and all other process except a subpoena may be served anywhere in the
United States." Fed. R. Bankr. P. 7004(d). A bankruptcy court may exercise personal jurisdiction over a defendant
served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the
United States." Fed. R. Bankr. P. 7004(f).

[10]     Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may
exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v.
Montana Eighth Jud. Dist. Ct.*, 592 U.S. -----, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear
Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The
Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Mem. L. at 8, ECF No. 115
("Plaintiffs do not allege that the Court has general jurisdiction over MLI, a U.K. stockbroker that is not 'at home' in
the United States. Therefore, Plaintiffs must plead facts supporting the exercise of specific jurisdiction over MLI.");
Opp'n at 2, ECF No. 148 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the
forum that relate to the claims at issue).

jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)).  A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Following discovery, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball*, 902 F.2d at 197.  "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85).  "Now that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy."  2023 WL 5016884, at *6 (citing 722 F.3d at 85).  "Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported." *Id.* at *6.  When considering a motion to dismiss before or after jurisdictional discovery has taken place, "the court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).

### B. Analysis of Purposeful Availment

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68,

82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161,

170 (2d Cir. 2013)).  For specific personal jurisdiction, "'[c]ourts typically require that the

plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the

episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful

contacts with the forum.'"  *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine

Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)).  "Although a defendant's contacts with

the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or

other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an

insufficient basis for jurisdiction.'"  *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*,

571 U.S. at 134) (alteration in original).  "It is insufficient to rely on a defendant's random,

fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to

establish specific jurisdiction."  *Id.*

Defendant asserts that the "Plaintiffs have previously agreed that their claims are purely

foreign."  Mem. L. at 2, ECF No 115.  Defendant refers to the Plaintiffs' 2021 arguments before

the District Court in which Plaintiffs claimed that the "redemption transfers at issue here were

purely foreign" and that "every relevant component of the transactions at issue here occurred

outside the territorial jurisdiction of the United States."  *Id.*; *see also* Pls.-Appellants' Opening

Br. for Second Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-

3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief").  The Plaintiffs' Opening

Brief concerned the extraterritorial application of the § 546(e)[11] safe harbor.  *See* Opening Brief

---

[11]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment
or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant,
stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or
to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial
participant, or securities clearing agency, in connection with a securities contract. . . ."  11 U.S.C. § 546(e).

at 24 (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

### 1. Defendant's Use of Correspondent Accounts

The Plaintiffs point to the Defendant's choice to use correspondent accounts at JP Morgan Chase, New York ("Chase") as sufficient to establish minimum contacts with the United States. Opp'n at 24, ECF No. 148. "Correspondent accounts are accounts in domestic banks

held in the name of foreign financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dep't 1996)).  Plaintiffs allege that Defendant "deliberately and repeatedly utilized U.S. bank accounts" to effectuate the subscription and redemption payments that form the harms for which Plaintiffs seek redress.[12]  Opp'n at 2, ECF No. 148; *id.* at 8 ("At least ten times from 2005 to 2007, MLI intentionally and knowingly chose to use its U.S.-based correspondent account at Chase New York to process its subscription payments and to receive its redemption payments from Sentry.").

Defendant argues that its alleged receipt of payments at a U.S.-based correspondent bank account is insufficient to establish personal jurisdiction and that "mere use of a bank account at a U.S. financial institution to facilitate the receipt of five dollar-denominated payments would not subject MLI to personal jurisdiction in the United States."  Mem. L. at 4, ECF No. 115 (citing *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010)); *see also* Mem. L. at 16 (citing *Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017)).

The cases that Defendant relies upon are distinguishable from the circumstances here.  In *Tamam*, the District Court made clear that the complaint failed to provide "allegations that any money from any of these accounts was exchanged for U.S. dollars through a correspondent bank in New York."  *Id.* at 727.  The District Court noted that the missing proposition, "i.e., the actual

---

[12]    The use of correspondent accounts concerns only the transfers that originated from Sentry.  Opp'n at 23, ECF No. 148 ("Over 88 percent of the redemptions at issue in this case were from Sentry.").  The investments in Sigma were in Euros, not U.S. dollars, and therefore did not require the use of U.S. correspondent accounts.  Am. Compl. ¶ 36–37; *see also* Mem. L. at 4 n.2, ECF No. 115 ("Sigma investments were denominated in Euros, not U.S. dollars. Plaintiffs do not assert jurisdiction with respect to redemptions from Sigma based on the use of correspondent accounts."); *see also* Opp'n at 24 n.25 ("While MLI did not designate a U.S. correspondent account for its redemption of Sigma shares, it is still subject to jurisdiction with respect to those transactions . . . .").

transfer of money through New York" was the "only factual predicate on which th[e] Court

could potentially base its jurisdiction." *Id.*; *see also Licci ex rel. Licci v. Lebanese Canadian

Bank, SAL*, 673 F.3d 50, 58 (2d Cir. 2012) (discussing the failure of plaintiffs in a case "factually

similar" to *Tamam* to allege that the conduct giving rise to the cause of action was directly

financed by funds transferred through New York).

 *Hau Yin To v. HSBC Holdings PLC*, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), found no

basis for personal jurisdiction over a foreign defendant where the "wiring of funds through New

York . . . was passive, rather than 'integral' to the alleged Ponzi scheme" and where the "passage

of money through the U.S. bank accounts w[as] merely incidental and not specifically directed

by any of the HSBC entities to facilitate the Ponzi scheme." 2017 WL 816136, at *7 n.6. These

facts were contrasted with those presented in *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 68

N.E.3d 1 (2016), where the New York Court of Appeals "held that the foreign bank was subject

to personal jurisdiction in New York because the 'defendants [including the foreign bank]

orchestrated the money laundering and . . . the New York account was integral to the scheme.'"

*Id.* (citing *Rushaid*, 28 N.Y.3d at 328, 68 N.Y.3d at 11) (alterations in original). Furthermore, in

*Rushaid*, "there was a scheme in which the foreign bank specifically contemplated wiring tainted

funds into a New York account from which corrupt payments were then further distributed to

individuals with accounts at the foreign bank." *To*, 2017 WL 816136, at *7 n.6.

 Defendant's Reply cites to *Vasquez v. H.K. & Shanghai Banking Corp. Ltd.*, 477 F. Supp.

3d 241 (S.D.N.Y. 2020) as another case establishing the supposed rule that the use of New York-

based correspondent bank accounts without choosing to transact in U.S. dollars does not suffice

to establish personal jurisdiction. Reply at 7, ECF No. 151. Similar to *Hau Yin To*, the District

Court in *Vasquez* distinguished between the "'unintended and unapproved use of a correspondent

bank account, where the nondomiciliary bank is a passive and unilateral recipient' of money

transfers, and the '[r]epeated, deliberate use that is approved by the foreign bank on behalf and

for the benefit of a customer[.]'" 477 F. Supp. at 253 (alteration in original) (quoting *Rushaid*,

28 N.Y.3d at 326–27).

Finally, with regard to *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339–40 (S.D.N.Y.

2016), the Court notes that the import of this case was already discussed by the District Court in

*Great W. Ins. Co. v. Graham*, No. 18-CV-6249 (VSB), 2020 WL 3415026 (S.D.N.Y. June 22,

2020). The District Court explained in *Graham* that under *Hill*, a court evaluating whether a

defendant purposefully availed itself of conducting activities in the forum must "look[] at the

totality of the circumstances." *Id.* at *11. "While [one] fact alone might not necessarily be

sufficient, . . . upon consideration of the 'totality of the circumstances,'" the Court may

nevertheless find that the Defendant purposefully availed itself of New York. *Id.* at *16 (quoting

*Hill*, 207 F. Supp. 3d at 338).

Here, the Plaintiffs have shown that the Defendant was able to use a foreign-based or a

U.S.-based correspondent bank account for its redemption requests and chose the latter. *See* Joyce

Decl. at 5–9, ECF No. 150.; *id.* at 11 ("[S]ubscription agreements for Fairfield Sentry . . . do not

contain any requirement that the subscriber utilize a U.S. account to send subscription payments

or receive redemption payments."); *id.* at 12 ("Neither the fact that Fairfield Sentry was a U.S.-

dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire

their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption

payments from its own U.S. account would have prevented a subscriber from making subscription

payments from and directing redemption payments to a U.S. dollar account located outside the

U.S."); *id.* ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period,

and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

This was no passive endeavor; the Plaintiffs allege that Defendant "*actively used* its U.S. correspondent account and Sentry's U.S. account" to transact with the Fairfield Funds. Opp'n. at 28, ECF No. 148. It did so repeatedly, using the correspondent accounts to send at least ten subscription payments totaling $28,600,000 to Sentry's U.S. Correspondent account at HSBC Bank, New York, and to receive five redemption payments totaling $14,200,000 from Sentry at MLI's account at JP Morgan Chase in New York. Flugman Decl. Exs. 32–40, ECF No. 149; Am. Compl. ¶¶ 44–46, ECF No. 96. MLI accomplished the conduct at the heart of the Liquidators' claims through its use of the correspondent accounts. The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations to support a finding of sufficient minimum contacts. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013).

Defendant further argues that the Court should dismiss the Complaint due to the perceived disastrous results of finding jurisdiction under these circumstances when Defendant asserts states that "[w]ere the incidental use of U.S.-based accounts sufficient to confer personal jurisdiction over foreign entities, New York would become a forum for any foreign commercial dispute, contrary to federal and state policy, merely because global transactions are frequently cleared in U.S. dollars." Mem. L. at 17, ECF No. 115.

MLI's concern for the results of finding jurisdiction is unpersuasive. The Second Circuit has stated that "[s]imply transacting in U.S. dollars does not make a defendant bank amenable to

suit in New York." *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 643 (2d Cir. 2023); *see also In re Lifetrade Litig.*, No. 17-CV-2987(JPO), 2021 WL 1178087, at *3 (S.D.N.Y. Mar. 29, 2021) (finding that by simply carrying out a transaction in New York "the connection [between the transaction and the claim] would not rise above the 'merely coincidental,' . . . as most large businesses move money through New York at one point or another."). Furthermore, courts in this district have "routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction." *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010); *Licci*, 732 F.3d at 171 ("[W]e by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy."); *see also Leema Enterprises, Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (describing the "mere maintenance" of a correspondent account to mean that the accounts were "unrelated to the fraud alleged" and that there were no other allegations of "affirmative conduct allegedly required of the [defendant] in connection with the contract . . . .").

However, a defendant's selection and repeated use of a New York correspondent account, where the specific selection was at the defendant's direction, can show that the contacts with "New York [are] not random or fortuitous but sufficiently purposeful to satisfy New York's long-arm statute." *Spetner*, 70 F.4th at 640–42. This is true even though "New York remains the 'national and international center for wholesale wire transfers' . . . ." *Id.* at 642 (quoting *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370, 568 N.Y.S.2d 541, 570 N.E.2d 189 (1991)). Where a foreign bank alternative may be less attractive to a defendant, that is only

further support for the proposition that the purpose of holding the New York correspondent account is "to gain convenient access to New York's financial system." 70 F.4th at 642.

### 2.  Defendant's Business Contacts with the Forum

The Liquidators assert that Defendant "intentionally invested in BLMIS feeder funds Sentry and Sigma knowing that the Funds were designed to subsequently invest that money in New York-based BLMIS. [MLI] is subject to this Court's jurisdiction with respect to its Sentry and Sigma redemptions as a result of that conduct." Opp'n at 13, ECF No. 148.  Defendant describes the allegations that it knew the subscription payments into the Fairfield Funds would be invested in BLMIS in New York as insufficient as a matter of law to support jurisdiction as the Amended Complaint fails to show that the Defendant purposely directed activity toward the forum state.  *See* Mem. L. at 13, ECF No. 115 (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014) and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as he "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Walden*, 571 U.S. at 289. The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.*  As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State." *Id.* at 285. Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros*, 466 U.S. at 418. The Supreme Court found that "one trip" to the forum "for the purpose of negotiating the transportation-services contract . . . cannot be described or regarded as a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416. The Liquidators, however, have described more substantial contacts here.

First, the Liquidators point to the documents given to Defendant by the Funds' U.S.-based manager, Fairfield Greenwich Group ("FGG"), which made it "clear that the main purpose of the Funds' existence was to invest in BLMIS" in New York. Opp'n at 6–7, ECF No. 148; *see* Flugman Decl. Ex. 29, ECF No. 149 (Sentry offering materials describing BLMIS as the broker-dealer to which Sentry "allocates the predominant portion of the Fund's assets."); Defendant received memoranda at the time it subscribed into the Fairfield Funds that explained the objective of the funds was to

> obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as 'split strike conversion', to which the Fund allocates the predominant portion of its assets . . . . The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC . . . a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Fund at that firm.

*Id.* Ex. 30 at -5897 (August 2006 Private Placement Memoranda of Sentry); *see also id.* Ex. 31 at -5731 (February 2006 Private Placement Memoranda of Sigma). Exhibits supplied in the Miller Declaration confirm that MLI understood that an investment in the Fairfield Funds was effectively an investment in BLMIS in New York. Miller Decl. Ex. 1, Oct. 2004 Sentry Private Placement Memorandum at -6862, -6874–6875, ECF No. 152 (stating that the fund's objective

would be achieved through the split strike conversion strategy and that, at that time, BLMIS had "approximately 95% of the Fund's assets under custody.").[13]

In August 2018, this Court held that it does not have personal jurisdiction over certain defendants due to subscription agreements that provided for consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund." *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018). The Liquidators here rely on the subscription agreements and private placement memoranda not to show consent, but to show that when Defendant invested in the Fairfield Funds, it did so knowing that it would avail itself of the benefits and protections of New York. Opp'n at 31–32, ECF No. 148. The subscription agreements, in this way, support the Plaintiffs' showing of contacts with the forum.

Second, evidence shows that MLI repeatedly contacted the manager of the Fairfield Funds in the U.S., Fairfield Greenwich Group, seeking information about the Funds and entities working with the Funds. Flugman Decl. Ex. 17, ECF No. 149 (email between employee with @fggus.com address and employee with @ml.com address discussing a recent telephone call and seeking "details to close this trade" concerning Fairfield Sentry); Ex. 18 (email between same employees discussing the relationship between different FGG entities and providing "condensed financials" for Fairfield Greenwich Limited); Ex. 19 (email from employee with @ml.com address to employee with @fggus.com address asking for a "better understanding of the different entities working with Fairfield . . ." and discussing a potential conference call). Defendant discussed with clients the risks of investing with "Fairfield Sentry/Madoff," specifically the risk

---

[13]    Defendant correctly pointed out at the October 25, 2023, hearing that the 2004 private placement memorandum does not explicitly refer to Bernard Madoff or to BLMIS in the five paragraphs following the statement explaining Sentry's investment policies. Hr'g Tr. 107:2–5, ECF No. 170 ("It goes on for five additional paragraphs to describe that strategy. It never once mentions BLMIS. This is in stark contrast, Your Honor -- and again, this is the 2004 private placement memorandum . . . ."). However, this memorandum expressly names BLMIS as the sub-custodian of the fund in the following pages. *Id.* at 115:23–116:1 ("not only does it refer to [BLMIS], it makes it clear that that's where the money -- that's where 95 percent of the money is going.").

of a "blow-up." *Id.* Ex. 50. Internally, MLI employees discussed the red flags of Fairfield

Sentry and BLMIS. *Id.* Ex. 51 (stating that the "the fund manager refuses to meet potential

clients"). Defendant performed multiple rounds of due diligence and rated Sentry and Sigma

"not approved." *Id.* Ex. 26; *see also* Ex. 25 (email from employee of Defendant asking another

to "take a look at Madoff and let me know what you think from a Due diligence perspective.").

Over the years Defendant actively monitored the Fairfield Funds and BLMIS in New York with

respect to their investments. These contacts demonstrate more than mere purchases or a one-time

visit to the forum. The Liquidators have demonstrated facts showing continuous and systemic

contacts with the forum.

      The Defendant finally argues that the Plaintiffs' allegations amount to "nothing more

than the type of 'stream of commerce' theory of personal jurisdiction rejected by the Supreme

Court" in  by *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, (2011). Mem. L at 14, ECF No.

115. In *Nicastro*, the Court stated that "it is not enough that [a] defendant might have predicted

that its goods will reach the forum," but rather the defendant must "engage[] in conduct

purposefully directed at [the forum]." *Nicastro*, 564 U.S. at 882–86. The Liquidators argue that

the Defendant did not merely expect that the investments would reach the United States, but

rather that Defendant's express purpose of investing in the Fairfield Funds was to invest with

BLMIS in New York. Opp'n at 21, ECF No. 148 ("Liquidators argue that MLI chose to invest

in the Funds with the specific purpose of having its clients' money invested in U.S.-based

BLMIS, and that it did so while knowing that the Funds were obligated under the investment

contracts to facilitate that aim, including by directing at least 95% of funds invested to

BLMIS."). This conduct was purposefully directed at the forum.

The Court thus finds that Defendant's selection and use of U.S. correspondent accounts and communications with Fairfield Greenwich Group support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong. The contacts are not random, isolated, or fortuitous. The contacts demonstrate MLI's purposeful activities aimed at New York in order to effectuate transfers from the Fairfield Funds. The Plaintiffs have thus provided facts that sufficiently support a prima facie showing of jurisdiction over the Defendant.

### C. Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. ----, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, a court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the Plaintiffs fail to "allege that their claim arises out of or relates to MLI conduct in New York." Mem. L. at 2, ECF No. 115. However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated. Am. Compl. ¶¶ 116–28, ECF No. 96. The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS. The allegations

are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds. The Defendant's contacts with the United States, in investing in the Fairfield Fund and communicating and meeting with Madoff form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum. *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

### D. <u>Whether Assertion of Personal Jurisdiction is Reasonable</u>

If a defendant has sufficient minimum contacts, the Court must then ask "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Where the plaintiff "makes the threshold showing of the minimum contacts required for [exercising personal jurisdiction], a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3 (quoting *Bank Brussels Lambert*, 305 F.3d at 129). Factors the Court will consider include the burden on the defendant; the interests of the forum in adjudicating the case; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the states in furthering fundamental substantive social policies. 305 F.3d at 129.

The Defendant argues that "the United States' interest in adjudicating this dispute is minimal at best. The dispute is between foreign parties arising under foreign law pursuant to a

foreign contract for the return of cash sent between two foreign countries in a purely foreign

transaction." Mem. L. at 21, ECF No. 115.  Defendant further argues that the claim is "non-core,

there are no alleged debtor assets in the United States, and Plaintiffs have not sought relief in

their pending Chapter 15 case in years." *Id.* at 21–22.  (citing *In re Fairfield Sentry Ltd.*, 458

B.R. 665, 685 (S.D.N.Y. 2011) (Preska, J.)).

      The Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced.  In

that case, the District Court determined whether the proceeding was core or non-core; it did not

determine whether adjudication or jurisdiction in the United States was reasonable.  *See id.* at

675.  Further, the Court has already found that it has subject matter jurisdiction over these

proceedings.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *8 (Bankr. S.D.N.Y. Aug. 6,

2018).

      Defendant argues that discovery "would involve cross-border discovery issues that could

implicate foreign laws." Mem. L. at 22, ECF No. 115.  In support of this argument, Defendant

cites to a ruling in which the Court granted in part and denied in part a motion seeking relief as to

the order staying the action and seeking expedited initial disclosures on beneficial holders. *Id.*;

*see* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799.  This Court based that ruling on a

comity analysis in light of the then-uncertain "offshore underpinnings for this litigation in its

entirety." *Id.* at 2.  The Court stated in that ruling that it was "hard-pressed to find any

compelling United States' interest in mandating discovery here *at this juncture* of the pending

litigation." *Id.* (emphasis added).

      The Defendant has not shown that the interests at stake in that proceeding over ten years

ago, are the same as those at stake now.  Although Defendants were previously able to identify

specific laws in foreign countries that would have been broken by complying with the Court's

prior order, MLI now only describes a situation that "could implicate foreign laws." Mem. L. at 22, ECF No. 115. This Court lifted the stay and required the Defendant to proceed to discovery in 2021. Order Lifting Stay, ECF No. 94; Scheduling Order, ECF No. 113. The July 2012 Bench Ruling shows that this Court is capable of alleviating specific burdens identified by a defendant. The mere potential for exposure to unspecified liability is not a burden which renders exercise of jurisdiction unreasonable.

Defendant argues that the Plaintiffs "have not demonstrated that it is more reasonable for them to litigate their claims against MLI in New York rather than in the BVI, . . . or in the United Kingdom, where MLI is at home and where U.K. courts could address discovery from MLI." Mem. L. at 23, ECF No. 115. The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023). MLI has participated in this litigation with representation by U.S. Counsel for at least seven years. *See, e.g.,* Notice of Appearance, ECF No. 17. Defendant has a parent company with a principal place of business in New York and numerous affiliates operating around the world. Am. Compl. ¶ 33, ECF No. 96. Furthermore, the United States has a strong interest in ensuring the integrity of its financial systems.

Defendant has alleged that other forums may be able to hear the claims. What it has not done is demonstrate how this forum would fail to provide effective relief. *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3. Defendant does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction. *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023). The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable. The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with "traditional notions of fair play and substantial justice . . . ." *See Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the Amended Complaint. The Liquidators shall submit a proposed order consistent with the findings in this decision in accordance with Local Bankruptcy Rule 9074-1(a).

**IT IS SO ORDERED.**

Dated: February 7, 2024
       New York, New York

                              /S/ John P. Mastando III

                              THE HONORABLE JOHN P. MASTANDO III
                              UNITED STATES BANKRUPTCY JUDGE